IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2013 JUL 24  PM 2: 36

CLERK U. S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| V. | § | CAUSE NO. A-13-CR-032-LY |
| | § | |
| JEFFERY ALLEN LINDSAY | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS

Before the court is the above styled and numbered cause in which Defendant Jeffery Allen Lindsay is charged by indictment with the offense of possession with intent to distribute methamphetamine. *See* 21 U.S.C. § 841(a)(1). By Motion To Suppress Illegally Seized Evidence, Lindsay contends that all evidence seized from his automobile and from his person following a traffic stop must be suppressed, as the investigating officer obtained the evidence in violation of Lindsay's Fourth Amendment protection against unreasonable searches and seizures (Clerk's Document No. 21).[1] Specifically, Lindsay argues that the officer improperly detained him beyond the scope of a valid traffic stop, and that the "alert" by Buddy, a drug-detection dog, did not provide probable cause to search Lindsay's automobile. The United States responds that Lindsay's detention was proper and Buddy's alert provided the officer probable cause for the search (Clerk's Document No. 25). The court held an evidentiary hearing on Lindsay's motion, at which Lindsay appeared and all parties were represented by counsel.[2]

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

[2] The court convened the hearing on June 13, 2013, which was recessed that day. The court reconvened and concluded the hearing on June 18.

Having considering the motion, the response, the reply, the testimony and exhibits admitted during the hearing, the arguments of counsel, and the applicable law, the court concludes that the United States has shown that the officer on the scene had an objectively reasonable suspicion that traffic violations occurred before stopping Lindsay's automobile, thus, the stop was justified at its inception. Further, the court concludes that the elapsed time of the officer's investigation of the circumstances that caused the officer to stop Lindsey was reasonable and that, during that time, the officer developed reasonable suspicion of additional criminal activity. The court concludes that the officer's action in utilizing a drug-detection dog was justified. Finally, the court concludes that, by the standards of today, Buddy is a reliable detector of drugs, and probable cause existed, because the facts surrounding Buddy's alert "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, ___ U.S. ___, 133 S.Ct. 1050, 1058 (2013) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

**Background**

Kimble County Deputy Sheriff Billy Hull and Buddy are the dedicated K-9 unit in Kimble County, Texas. Buddy has served with Hull in Kimble County since September 2006 and is Hull's third drug-detection dog. Hull patrols and works drug interdiction primarily on U.S. Highway 83 and Interstate Highway 10, the latter a known drug corridor. Throughout his career, including since 2000 when he joined the Kimble County Sheriff's Office, Hull has received special training in drug

interdiction and enhanced training in personal interaction, body language, and other nonverbal behavior that might indicate an individual is concealing something.[3]

Hull explained the process he uses every time he makes a traffic stop. Hull checks for a valid driver's license, insurance, and car registration. Hull uses "who, what, where, when, and why" questions with a driver when making a traffic stop to evaluate whether a search of the vehicle might lead to concealed drugs. Hull says the most important factor he considers is a person's demeanor. In Hull's experience, the normal motoring public will be nervous during a traffic stop, however, people who are hiding drugs tend to act differently. In Hull's experience, individuals who are shaking a lot during his questioning, blink their eyes rapidly, and act defensively may be hiding drugs. Hull often encounters rehearsed stories. Also, issues that arise during a stop with regard to rented cars and car ownership are factors Hull considers in drug interdiction. Hull explained that in working drug interdiction, what he is looking for is something out of the ordinary in a traffic stop.

Hull explained that Buddy is an "aggressive indicator" as opposed to a "passive indicator," which means that when Buddy notices the scent of drugs or "goes into odor" his ears and tail go up and he will bark, jump, sniff, and scratch at the portion of the car where Buddy picks up the odor of drugs. An aggressive-alert dog like Buddy will want to stay with the odor. A drug-detection dog that is a passive indicator will sit upon detecting an odor of drugs. Buddy is certified for four narcotics: marijuana, methamphetamine, cocaine, and heroin. He was originally certified in May 2007 by the National Narcotic Detector Dog Association, Inc. ("NNDDA") and has been recertified

---

[3] Before working for Kimble County, Hull spent slightly over a year doing drug interdiction with a regional task force while he was employed with the Pecos Police Department in Reeves County, Texas.

by that organization every year since.  Hull testified that Buddy has never falsely alerted in any controlled-environment test.

On August 11, 2012, Hull was patrolling Interstate 10 in Kimble County at 7:15 a.m. when he noticed a red Cadillac automobile proceeding in the left lane without passing any vehicles.  The left lane is marked as a "passing only" lane.  Hull u-turned to follow the car and noticed that it did not have license plates or a registration sticker on the front windshield.  Hull initiated a traffic stop by activating his emergency lights and siren.[4]

As Hull approached, the driver, Lindsay, got out of the vehicle.  Hull considered this unusual because, according to Hull, most people remain in their vehicle during a traffic stop.  Hull recognized Lindsay from a federal criminal proceeding that had occurred several years earlier when Hull worked for law enforcement in Pecos, Texas.  Hull stated that Lindsay had been convicted of firearms violations in the Pecos proceeding.

Hull observed that Lindsay had a dog in the car as well as cantaloupes.  Hull asked Lindsay for his driver's license and proof of insurance.  Hull questioned Lindsay about the vehicle's lack of license plates and registration sticker.  Lindsay said he had an insurance card but no registration or title.  Lindsay said he had purchased the Cadillac in Alabama several months earlier.  Lindsay showed Hull two insurance cards, one expired and one current, which together showed that Lindsay had been insured for the vehicle for more than a year.  Lindsay also showed Hull a bill of sale.  Hull initially thought Lindsay was behaving normally, however, Hull's impression was that Lindsay's demeanor changed during Hull's questioning him about the vehicle.  Lindsay told Hull that he was

---

[4] A DVD of the traffic stop, which contained video only, was admitted as evidence and played during the hearing.  Hull explained that the audio transmission in his vehicle was malfunctioning so that only a video was produced of the stop.

in a hurry, was talking in a fast-paced manner, and breathing heavily. Hull noticed Lindsay's face muscles were "jumping" and at that point Hull thought Lindsay was under the influence of "something." Lindsay, was standing in a defensive position and told Hull that he was headed from Pecos to Austin for the "boat races." Later, Hull recalled that Lindsay said he was headed to Marble Falls, which is where the boat races are held. Lindsay told Hull he had been stopped by a deputy sheriff in Ozona, Crockett County–west of Kimble County–two hours earlier, and the deputy had let him go without searching his car.

After conversing with Lindsay, Hull took the vehicle information back to his patrol car and attempted to run the information through his patrol-car computer, but no information was returned. Hull radioed his dispatcher and requested assistance in checking the registration of Lindsay's vehicle. Hull explained that at this point, based on his observations of Lindsay and Lindsay's responses to Hull's questions, Hull believed there was contraband in the Cadillac. Hull then asked Lindsay if he could search the vehicle. Lindsay denied Hull's request. Hull then asked Lindsay to step away from the car but to leave his dog inside.

Ten minutes into the traffic stop, when Hull had not received a response from his dispatcher, he brought out Buddy to perform a sniff around the outside of Lindsay's car. Hull explained that Buddy picked up an odor of narcotics, gave two aggressive alerts, and never came off of the odor. Hull told Lindsay about Buddy's alerts, informed Lindsay the car would be searched, and asked Lindsay to get his dog out of the vehicle. Hull found a nylon zip bag containing a methamphetamine pipe and methamphetamine residue on the floor of the front driver's side. Hull told Lindsay that he was going to detain him and then handcuffed him. Hull searched Lindsay and found methamphetamine in one pocket and marijuana in another. Although Lindsay told Hull that he only

5

had a few hundred dollars with him from his business, Hull found over $3000 in Lindsay's car. Additionally, from the vehicle, Hull recovered several grams of crystal, a scale, a white methamphetamine pipe, a marijuana pipe, and 70 doses of Valium. After the search was concluded, Hull received information from the dispatcher that Lindsay's vehicle was registered to a firm in Florida.

Rupert Peña, a patrol deputy with the Crockett County Sheriff's Department, stopped Lindsay the same morning around 5:00 a.m. in Ozona, for no license plate. It took about 20 minutes for Peña to get information regarding Lindsay's vehicle registration. Peña's concern was that the car was stolen. Peña learned that Lindsay had a criminal history and Peña asked Lindsay to allow him to search the car, but Lindsay denied the request. Peña made the decision to allow Lindsay to travel on about 30 minutes after he had initiated the traffic stop.

John Stapp, the sheriff's department nighttime dispatcher in Kimble County, testified that he received a call from Crockett County at 5:40 a.m. asking Stapp to pass along information to Hull regarding a red Cadillac's driver's "refusal" to consent to a search during a traffic stop, which Stapp did. According to Stapp, Hull said that he would take care of it.

Lindsay's refusal to consent to a search of his vehicle in Crockett County indicated to Hull that Lindsay was "up to no good," Hull nevertheless observed Lindsay commit driving infractions and Hull gathered his own information.

6

At the hearing, Lindsay called Steven Nicely as an expert on law-enforcement-dog training.[5] Nicely has trained about 750 dogs for law-enforcement service. His method applies human behavioral science to dogs. He trains dogs to give passive rather than aggressive alerts. He stated that to be proficient, dogs must do discrimination testing continuously and should be trained four hours per week or 16 hours per month. Nicely explained that he employs more vigorous standards than does the NNDDA. Nicely testified that dogs not trained in blind or double blind tests can react to very subtle signs or cues from their handler. After reviewing the video of Hull and Buddy working together around Lindsay's car, Nicely opined that Buddy's alerts were reactions to Lindsay's dog, which was inside Lindsay's car. Nicely also found it significant that there is no indication in Buddy's training records that Buddy is trained to ignore false stimuli, such as the cantaloupes, Lindsay's dog, or packaging. In Nicely's opinion, Buddy did not give a reliable alert. Nicely conceded, however, that NNDDA, the organization that certified Buddy every year since 2007, is one of the top three certifying agencies for detection dogs. Further, Nicely acknowledged that there is no national standard for the types of training records that must be maintained for drug-detection dogs.

**Analysis**

On a motion to suppress evidence, the defendant has the burden of proving by a preponderance of the evidence that the seizure was in violation of the defendant's constitutional rights. *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). However, if the defendant

---

[5] Although there does not appear to be a recognized discipline of law-enforcement- or drug-detection-dog training, based on Nicely's background and experience, the court allowed and considered his testimony as "other specialized knowledge" sufficiently reliable to allow him to state opinions. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Harris*, 133 S.Ct. at 1057.

was arrested or subjected to search without a warrant, the government bears the burden of proof. *Id.* Here, the seizure of evidence and Lindsay's arrest were made without a warrant, therefore, the government bears the burden of proving that its actions were constitutional.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). "The stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment." *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). Under *Terry*, the legality of a traffic stop is tested in two parts: first, whether the vehicle stop was justified at its inception; and second, whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place. *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011).

"An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *Id.; United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (if officer develops reasonable suspicion of additional criminal activity during investigation of circumstances that caused stop, officer may further detain occupants for reasonable time while appropriately attempting to dispel reasonable suspicion).

In determining reasonable suspicion, courts look to the totality of the circumstances related to the detaining officer's actions to see whether that officer had a particularized and objective basis for suspecting illegal wrongdoing. *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992). "This process allows officers to draw on their own experience and specialized training to make

8

inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. at 750-51 (quoting *Cortez*, 449 U.S. at 418); *see also Rideau*, 969 F.2d at 1574 ("In assessing the reasonableness of an officer's actions, 'it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of seizure or the search[,] warrant a man of reasonable caution in the belief that the action taken was appropriate?'" (citing *Terry*, 392 U.S. at 22)). Finally, the officer's state of mind, or his stated justification for his actions, is not the focus of the inquiry. *Rideau*, 969 F.2d at 1574. "As long as all the facts and circumstances, viewed objectively, support the officer's decisions, the Fourth Amendment is satisfied." *Id.*

Lindsay does not take issue with the first prong of the *Terry* analysis, however, he contents that Hull's subsequent actions were not reasonably related to the circumstances that justified the stop. Lindsay raises two arguments about Hull's actions: (1) Hull improperly detained Lindsay beyond the scope of the traffic stop; and (2) Buddy's alert was unreliable, and, therefore, Hull lacked probable cause to search Lindsay and the car.

### *Detention beyond scope of stop*

As part of the investigation into circumstances that justified Hull's traffic stop of Lindsay, Hull may and did properly examine Lindsay's driver's license and insurance, the vehicle's registration, and run computer checks with regard to these, as well as question Lindsay about the purpose and itinerary of his trip. *Macias*, 658 F.3d at 517 ("Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made.")

Under certain circumstances, extensive questioning about matters wholly unrelated to the purpose of a routine traffic stop will violate the Fourth Amendment. *See United States v. Kelly*, 981 F.2d 1464, 1470 (5th Cir. 1993). On the other hand, an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. *Pack*, 612 F.3d at 350. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. *Id.* "Thus, no Fourth Amendment harm is done where the officer asks the occupant[] of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed." *Id.*

Lindsay contends that Hull's questioning improperly went beyond examining Lindsay's driver's license, insurance, and the vehicle's registration. Further, Lindsay argues that Hull described various actions by Lindsay during the stop that amount to Lindsay simply exhibiting nervousness, which cannot, standing alone, support a reasonable suspicion to further detain an individual beyond the scope of the traffic stop. *See Macias*, 658 F.3d at 520. Thus, argues Lindsay, as Hull lacked any reasonable suspicion to extend the traffic stop, Lindsay's Fourth Amendment rights were violated and all evidence obtained as a direct result of his illegal detention should be suppressed. *See Mapp v. Ohio*, 367 U.S. 643, 654-55 (1961).

The court disagrees with Lindsay's view of the testimony and evidence presented. The court initially finds Hull to be a credible witness. During Hull's inquiry of Lindsay, the issue arose as to whom the vehicle was registered. As the vehicle lacked license plates and a windshield sticker, and Hull was unable to quickly access registration information for the car on his patrol-car computer, Hull requested assistance from his dispatcher. While waiting for a response from the dispatcher, Hull continued to question Lindsay about his destination and other matters. Additionally, an issue

10

arose during Hull and Lindsay's conversation about Lindsay's insurance, which reflected that Lindsay had been insured for the vehicle for more than a year despite Lindsay telling Hull that he had purchased the car a few months previously.  Also, while waiting for the response from the dispatcher, Lindsay acted defensively, Hull noticed Lindsay's face muscles twitching, Lindsay was talking rapidly, and breathing heavily.  Hull thought that based on these observations, Lindsay was under the influence of narcotics.  It was only about 10 minutes from the time Hull initiated the traffic stop until he determined to utilize Buddy for a sniff around Lindsay's vehicle.  Finally, it was after Buddy had provided aggressive alerts indicating the presence of narcotics in the vehicle, after Hull searched the car and found narcotics, and after Hull determined to arrest Lindsay, that the dispatcher responded to Hull's inquiry about the vehicle registration and informed Hull that the vehicle was registered to a Florida firm.

The court holds that there was no Fourth Amendment violation by Hull in asking Lindsay questions while awaiting information from the dispatcher about Lindsay's vehicle's registration.  The court concludes, from the totality of the circumstances, that it was objectively reasonable for Hull to have developed during that time a reasonable suspicion that Lindsay was involved in other criminal activity.

***Buddy's reliability***

Lindsay raises two challenges to Buddy's reliability:  (1) whether Buddy provided an alert, and, if so, whether the alert was caused by a cue from Hull, advertent or inadvertent, as opposed to Buddy's detection of narcotics; and (2) whether Lindsay's dog that remained in his vehicle during Buddy's perimeter sniff impacted the reliability of Buddy to provide an accurate alert.  Lindsay

11

contends that if the court sustains either challenge, Hull lacked probable cause to conduct a search based on Buddy's sniff of the car.

At issue is whether all of the facts surrounding Buddy's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *See Harris*, 133 S.Ct. at 1058. "Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 1057. If a *bona fide* organization has certified a dog after testing the dog's reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. *Id.*

A probable-cause hearing addressing the issue of a dog's alert should proceed much like any other probable-cause hearing–the court should allow the parties to make their best case, consistent with the usual rules of criminal procedure, and then evaluate the proffered evidence to decide what all the circumstances demonstrate. *Id.* at 1058. If the government has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has challenged the government's case by disputing the reliability of the dog overall or of a particular alert, then the court should weigh the competing evidence.

In weighing the evidence, Hull provided substantial information of Buddy's training and his proficiency in finding drugs. Buddy has been certified annually by the NNDDA since 2007 until the present. Hull also provided field training reports for the years 2007 through the present, showing that Buddy was tasked with locating narcotics in a controlled environment. The records reveal that Buddy "Responded Without Assistance" on 33 occasions with zero misses. Buddy successfully located narcotics with 100% accuracy in a controlled environment. The *Harris* court observed, "the

better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id.* at 1056. Hull also testified about his working with Buddy and measures he takes to ensure he is not improperly "cueing" Buddy, Buddy's alert style, the unit's training schedule, and the protocols Hull follows when conducting a dog-sniff of a vehicle.

Nicely challenges Buddy's reliability based on Buddy's training and also Buddy's sniff of Lindsey's car. Nicely trains drug-detection dogs to be passive-alert dogs rather than aggressive-alert dogs like Buddy. Nicely personally has not seen Buddy and has only reviewed the video of Hull's traffic stop of Lindsay and reviewed Buddy's certifications and training records. Nicely testified, however, that with his skills and experience, he is able to review a video and determine whether a dog is properly trained and is alerting to narcotics. Having reviewed the video of Buddy's sniff of Lindsay's car, Nicely's opinion is that Buddy is not properly trained. Nicely said that, during Buddy's sniff around Lindsay's vehicle, Buddy was looking up rather than focusing on the vehicle and was reacting to cues given by Hull rather than alerting to narcotics in Lindsay's car. Nicely's opinion is that Buddy's jumping up at the passenger side of the vehicle where Lindsay's dog was, was because "dogs want to investigate other dogs" and not an aggressive alert to the presence narcotics.

Nicely, although acknowledging that there is no legal standard for dog training, stated that he believes dogs should be trained 4 hours per week and that Buddy had spent too little time in training. Nicely testified that dogs can forget and they can be cued by their handlers. Additionally, Nicely finds it significant that Buddy has experienced no kind of discrimination training, which would teach him to not respond to other stimuli when narcotics are present. In reviewing Buddy's

13

training records, Nicely's opinion is that Buddy is minimally trained only to pass the certification test.

Nicely testified that he does not agree with the *Harris* Court that the best indicator of a drug-detection dog's reliability is how the dog performs in a controlled environment. *See* 133 S.Ct. at 1057. Although Nicely's opinion is that behavioral-science standards should be applied to drug-detection-dog training, he testified that there are no national standards for training such dogs and no standards for records that must be maintained regarding the dogs' training. Nicely conceded that the NNDDA is one of the top three organizations that certify drug-detection dogs.

This court is guided by *Harris*. There the Court found that Aldo, a drug-detection dog, had successfully completed two recent drug-detection courses and maintained his proficiency through weekly training exercises. The Court held that viewed alone, the dog's training record, with or without the prior certification, sufficed to establish the dog's reliability. *Id.* Here, although Buddy does not train four hours every week as did Aldo and as Nicely suggests is preferable, the overall extent of Buddy's training, his annual certifications by the NNDDA, and his previous success are sufficient indicia of his reliability. This court concludes Buddy's training is sufficient under existing training standards to establish the reliability of his alerts.

Nicely's behavioral-science approach to detection-dog training has not been adopted by the courts or the law-enforcement community as either a recognized method or the standard for analyzing the reliability of drug-detection dogs. Buddy has been annually certified by NNDDA, a well-recognized and respected organization that certifies drug-detection dogs. Buddy's annual certifications and his successful work in detecting narcotics in controlled testing-environments establishes that Buddy is a reliable drug-detection dog. Hull had good cause to view Buddy as a

14

reliable detector of drugs.  Further, the court finds that no special circumstances, such as Hull providing a cue to Buddy or Lindsay's dog being present in the car, affected Buddy's reliability.  The court finds no reason to discount Buddy's dependability or distrust his response to Lindsay's car. *See id.* at 1059.  The court finds that when all the facts surrounding Buddy's sniff of Lindsay's car and Buddy's alerts, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *See id.* at 1058.  Buddy's "sniff was up to snuff" and established probable cause for Hull to search Lindsay's car. *Id.*  There may be a day when human behavioral-science principles will be applied to canine behavior.  Today is not that day.

**Conclusion**

Having determined that Hull did not detain Lindsay for the August 11, 2012 traffic stop for an unduly lengthy period of time and that Buddy's alert provided Hull probable cause to search Lindsay's car, the court declines to suppress evidence that was recovered from Lindsay and his car during the stop.

**IT IS ORDERED** that Defendant Jeffery Lindsay's Defendant's Motion to Suppress Illegally Seized Evidence filed May 29, 2013 (Clerk's Document No. 21) is **DENIED**.

SIGNED this ___*23rd*___ day of July, 2013.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE